**Original filed 4/25/07**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEO A. SOMERSALL ) | No. C 04-1850 JF (PR) |
| ) | |
| Petitioner, ) | ORDER DENYING PETITION |
| ) | FOR WRIT OF HABEAS |
| vs. ) | CORPUS |
| ) | |
| A.K. SCRIBNER, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

Petitioner, proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for second degree robbery (California Penal Code §§ 211, 212.5). This Court found that the petition stated a cognizable claim and ordered Respondent to show cause as to why the petition should not be granted. Respondent filed an answer addressing the merits of the petition. Although given an opportunity to do so, Petitioner did not file a traverse. After reviewing the papers and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and will deny the petition.

\\\

\\\

\\\

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.jf\hc.04\Somersall850den        1

# I. BACKGROUND[1]

## A. Facts

### 1. The Robbery and Assault upon Israel Colchado

Shortly after midnight on Sunday, September 22, 1996, in Hopland, California, Enrique Garcia was stabbed to death and Israel Colchado was beaten and robbed. Resp. Mem. at 3. The defense contended that Petitioner was not responsible for Garcia's death and that Petitioner assaulted Colchado but did not rob him.

Shortly before midnight on September 21st, Garcia and Colchado were walking into the town of Hopland to buy beer, accompanied by two friends and fellow farm laborers, Timoteo Lopez and Fernando Gutierrez. The four men, who spoke little or no English, chose a route along railroad tracks just to the west of a cluster of cabins. Petitioner was staying in one of the cabins (number five) with his sister, Charlene Somersall, her three small children, and two teenagers, Kenny Faber and Kimberly Faber. Also present that evening were two other teenage girls–Jennifer and Veronica Faber–and another sister of Petitioner's, Karen Casillas.

It was undisputed that the four men approached Petitioner's group and that Colchado then walked to the store with Karen Casillas and Veronica. Resp. Mem. at 4. After those three left the immediate area, a fight ensued between Petitioner and Gutierrez and, possibly others, resulting in Garcia's death. Id. It was undisputed that after the fatal stabbing of Garcia, Petitioner was in or near his cabin. Id. At this point, Colchado, Karen, and Veronica returned from the store, and a fight ensued in which Colchado was beaten and robbed. Id. Colchado testified that he was about to leave the area when a man blocked his path and assaulted him. Suddenly, blows were falling on him from all sides. Although he never saw more than one assailant, he thought there had to be more than one. He was on the ground, face down, yelling, and felt kicks all over the place. Blood came out of his nose and mouth. The kicking stopped after a woman yelled something, and he then felt hands going through his pockets. He lost about $100 and a $50-dollar check. He got up and, with his head spinning, waked unsteadily back to the labor camp. The next day he was so sore, he could not get up. He worked in short spells, but only because he had to work in order to eat. At the time of trial, his ribs still did not feel right, his eyes hurt, and his vision remained cloudy. Photographs taken on Monday, September 23, showed an injury to Colchado's right eye and an abrasion on his shin and knee.

Santos Andrade, a resident of cabin number four, testified that he saw Colchado walking toward cabin number five. Colchado appeared drunk. A man Andrade knew as a resident of cabin number five came out of the cabin accompanied by another male, a boy of sixteen or seventeen, who Andrade had seen daily around the cabins. Andrade identified the first man, who had long hair and wore no shirt, as Petitioner. Andrade said Petitioner started the assault on Colchado, yelling at him, and pushing and hitting him. Petitioner and the younger man, joined by two or three women from cabin number five, continued the assault for a minute or two, knocking Colchado down and kicking him. Then the assailants went back inside their cabin and Colchado left.

Veronica testified that she did not see the beginning of the fight, but she did see Colchado on the ground, trying to cover his face, and saw appellant kick Colchado a total of thirty or forty times. Aided by Kenny, Karen went through Colchado's pockets. Petitioner turned Colchado over and Karen went through his back pockets.

---

[1] Unless otherwise indicated, the relevant facts are elicited from the published opinion of the California Court of Appeal, First Appellate District, People v. Leo Adam Somersall, Case Nos. AO81134 and A086816, (September 30, 1999) at 3-4, 8-10, 22-26, Respondent's Exh. I.

1   Someone was saying "Get the money, get the money."

2   **2. Jury Misconduct During Deliberations**

After the jury returned its verdicts on three counts alleged in the amended information and its findings on the special allegations, the trial court learned that in response to a request from the jury foreperson the bailiff provided jurors with a copy of Barron's Law Dictionary (3d ed. 1991) p. 537.  The next day, the trial court called the jurors into chambers one by one, placed each of them under oath, and proceeded to question them about the incident.[2]  Although the jurors had varying recollections of the timing of the request for and review of the dictionary, and the effect it had on their deliberations, certain commonalities in their testimony emerged.  All who had a specific recollection of what they were looking for said the purpose of the request was to clarify the meaning of the term "conscious disregard" for human life, as that term is used in the pattern jury instruction entitled "Malice Aforethought–Defined" (CALJIC No. 8.11 (6th ed. 1996)).  In relevant part, that instruction provides:  "Malice is implied when:  [¶] The killing resulted from an intentional act, [¶]The natural consequences of the act are dangerous to human life, and [¶] The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

It is also undisputed that the jury was unable to find the terms "conscious" or "conscious disregard" in the legal dictionary provided by the bailiff, and instead turned to the definition of "malice," which reads as follows:  "MALICE:  [1] The state of mind that accompnaies the intentional doing of a wrongful act without justification or excuse.  [Citation].  It refers to [2] 'an intent to cause the very harm that results or [3] some harm of the same general nature, or [4] an act done in wanton or willful disregard of the plain and strong likelihood that some such harm will result.  [5] It requires also on the negative side the absence of any circumstance of justification, excuse or recognized mitigation.'  [Citation].  [6] It denotes 'a reckless disregard of human life which proceeds from a heart and mind devoid of a just sense of social duty and fatally bent on mischief.'  [Citation].  [7] Blackstone first said that malice may be either express or implied in law.  EXPRESS [ACTUAL] MALICE is that type of malice aforethought that includes an intent to kill.  IMPLIED [CONSTRUCTIVE, PRESUMED] MALICE is a state of mind sufficient for murder but lacking in specific intent.  It is inferred from the conduct of the actor and the injury which results.  [Citations]."[3]

---

[2] This proceeding was conducted, over defense counsel's objection, in Petitioner's absence and before Petitioner had an opportunity to file a motion for new trial.  Defense counsel also repeatedly invoked Evidence Code Section 1150 and People v. Turner, 22 Cal.App.3d 174, 183, to contend that the court was improperly inquiring into the mental processes by which the jurors reached their verdicts.  For reasons that will become apparent, Petitioner does not renew his objections to the questioning conducted by the trial court in this case.  However, citing Rushen v. Spain, 464 U.S. 114, 117, and People v. Robertson, 48 Cal.3d 18, 60, Petitioner does here contend that the trial court's decision deprived him of his constitutional right to be personally present at all critical stages of trial.  (See also Pen. Code, § 977).  However, in light of the ruling on the prejudicial jury misconduct in this case, we do not need to reach the issue of the propriety of the trial court's decision to proceed in this fashion.  Plainly, the trial judge's intentions were laudable – i.e., to not inconvenience the jurors by potentially bringing them back in the future, to avoid potential difficulties in locating them, and to preserve the record while it was fresh in everyone's mind.  If anything, the record thus established by the trial judge actually worked in defendant's favor by clearly setting forth the prejudice that resulted from the misconduct.

[3] The bracketed numbers have been used uniformly by the parties to delineate the various definitions of malice that might have been considered by the jurors.  The brackets around the terms "ACTUAL" and "CONSTRUCTIVE, PRESUMED" were in the dictionary as provided to the jury.

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.jf\hc.04\Somersall850den            3

1    Several of the jurors testified that they consulted the legal dictionary at a point in their deliberations at which they were divided on the homicide charge and, perhaps, on the robbery charge as well. Apparently, some jurors read the definition of "malice" to themselves, and one read the definition aloud to the whole jury. Shortly after the definition was read, the jury reached unanimity on verdicts of second degree murder, robbery, and aggravated assault.

On November 3, 1997, Petitioner filed a motion for new trial contending, inter alia, that both the bailiff and the jury had engaged in misconduct as established during the post-verdict hearing. At a hearing on the motion for new trial, the trial court agreed but found the misconduct harmless on the theory that the dictionary definition of "malice" did not differ significantly from that contained in CALJIC No. 8.11.

**B. Procedural History**

A Mendocino Superior Court jury convicted Petitioner of second degree murder (Cal. Penal Code § 187), robbery (Cal. Penal Code § 211), and assault with force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)). The jury also found that Petitioner personally used a deadly weapon (Cal. Penal Code § 12022(b)(1)) and personally inflicted great bodily injury (Cal. Penal Code § 1203.075(a)(1)) in committing the murder, and that Petitioner inflicted great bodily injury (Cal. Penal Code § 1192.7(c)(8)) with respect to his robbery and assault convictions. Based on the trial court's finding two prior convictions as "strikes" under California's "Three Strikes" law, Petitioner was sentenced to a term of eighty-two years-to-life in state prison. Petitioner also was convicted of sodomy while in jail pending trial and sentenced to a consecutive term of twenty-six years-to-life.

On direct appeal, the California Court of Appeal reversed Petitioner's murder and assault convictions, affirmed the robbery and sodomy convictions, and remanded for re-sentencing. The California Supreme Court subsequently denied review. On remand, the trial court sentenced Petitioner to thirty-four years-to-life for the robbery and related enhancements and six years for his sodomy conviction. On appeal, the state appellate court struck Petitioner's great bodily injury enhancement and affirmed the judgment. Thereafter, the trial court sentenced petitioner to a term of seventeen years and four months on May 8, 2003.

The California Supreme Court summarily denied Petitioner's habeas petition on July 9, 2003. The instant federal petition was filed on May 10, 2004. The Court initially dismissed this action without prejudice for Petitioner's failure to pay the filing fee. On January 5, 2005, the Court vacated its judgment and reopened the case.

## II.  DISCUSSION

**A. Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or an involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards... are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the Petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B. Analysis of Legal Claim**

### 1. Jury Misconduct Regarding Petitioner's Robbery Conviction

Petitioner challenges his robbery conviction by alleging that he was denied due process when the trial court excluded him from a hearing concerning jury misconduct.[4] Although Respondent contends that Petitioner's claim is procedurally defaulted, Respondent also addresses the merits of Petitioner's claim. Resp. Mem. at 7. Accordingly, the Court will exercise its discretion not to address the question of procedural default and will review the merits, as set forth below.

After discovering that the jurors had consulted Barron's Law Dictionary during deliberations to clarify the meaning of the term "malice," the trial court conducted a hearing where each of the jurors was questioned under oath. Resp. Exh. I at 22-23. Although Petitioner was not present, defense counsel appeared at the proceeding and objected to the procedure. Id. at 22, fn. 6. The trial court subsequently held a hearing in response to Petitioner's motion for new trial, at which Petitioner was present. Resp. Exh. B, Volume 29 (Reporter's Transcript, "RT") at 4. The trial court concluded that although jury misconduct had occurred, the misconduct was harmless on the theory that the definition of malice referred to by the jurors did not differ significantly from that contained in the jury instructions. Id. at 26-27. The state appellate court disagreed and reversed Petitioner's murder conviction based on jury misconduct. The appellate court stated,

> In this case, it is not just a theoretical possibility that jurors reading the. . . dictionary definitions might have misunderstood or misapplied the definition of "malice" given to them by the trial court. As a result of the trial court's post-verdict inquiry, we know at least one hold-out juror was not convinced–until after consulting the legal dictionary–that the prosecution had proven appellant had acted with "malice," within the meaning of CALJIC No. 8.11, in the killing of

---

[4]Although Petitioner alleges four separate grounds for relief in the petition, the Court recognized one cognizable claim that includes all of Petitioner's allegations.

Garcia. Resp. Exh. I at 44-45. At the same time, the appellate court did not find that any prejudice resulted from the juror's misconduct with respect to Petitioner's robbery conviction. Petitioner nonetheless contends that his right to due process was violated with respect to the robbery conviction, based on his absence at this "critical stage of the proceedings" during the trial court's inquiry concerning the misconduct. Petition at 13.

The Supreme Court has recognized that "the right to personal presence at all critical stages of the trial . . . [is a] fundamental right[] of each criminal defendant." Rushen v. Spain, 464 U.S. 114, 117 (1983). This right derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. Campbell v. Wood, 18 F.3d 662, 671 (9th Cir. 1994) (en banc). The Confrontation Clause protects a defendant's right to face his accusers and applies to every stage of a trial. See Illinois v. Allen, 397 U.S. 337, 338 (1970). Due process, on the other hand, protects a defendant's right to be present "at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745 (1987); see, e.g., Sturgis v. Goldsmith, 796 F.2d 1103, 1108 (9th Cir. 1986) (finding due process right to be present at competency hearing determining competency to stand trial).

The Supreme Court has never held that exclusion of a defendant from a critical stage of the trial amounts to structural error. Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc). The rights to be present at all critical stages and to be represented by counsel, like most constitutional rights, are subject to harmless error analysis "'unless the deprivation, by its very nature, cannot be harmless.'" Id. (quoting Rushen, 464 U.S. at 117 n.2). In Campbell v. Rice, the Ninth Circuit held that Petitioner had failed to show that his counsel's conflict of interest adversely affected her representation of him and failed to show that the conflict deprived him of a fair and impartial trial, i.e., the conflict was harmless. Id. at 1172-73. Nevertheless, a defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will fall within the category of cases requiring automatic reversal. Hegler v. Borg, 50 F.3d 1472, 1476 (9th Cir. 1995). This was recognized as to

sentencing in Hays v. Arave, 977 F.2d 475, 479-81 (9th Cir. 1992). However, a panel's holding that a defendant's absence at the jury's delivery of the verdict in a capital case was structural later was rejected en banc. Rice v. Wood, 77 F.3d 1138, 1140-44 (9th Cir. 1996) (en banc).

The vast majority of cases involving a defendant's right to be present will be subject to a harmless error/prejudice analysis. See, e.g., United States v. Gagnon, 470 U.S. 522, 527 (1985) (harmless error where defendant and his counsel not present for in-camera meeting of judge, juror and lawyer for one defendant where juror expressed concern that defendant was sketching portraits of jury); Rushen, 464 U.S. at 117-18 & n.2 (if constitutional error occurred, then error is harmless as to ex parte communication between juror and judge regarding information forgotten during voir dire); United States v. Rosales-Rodriguez, 289 F.3d 1106, 1111 (9th Cir. 2002) (harmless error when the district court sent an unsolicited instruction to the jury outside the presence of the parties, as "the instruction was not coercive and did not cause the jury to rush to judgment"); Turner v. Marshall, 121 F.3d 1248, 1255 (9th Cir. 1997) (defendant's absence from jury room during readback harmless error).

Initially, Petitioner contends that, "[r]espondent implicitly conceded in Somersall I that the only real issue here is whether the admitted error in excluding Petitioner was prejudicial." Petition at 14. However, as Respondent points out, Respondent merely conceded that the hearing was "an important one," but in fact argued that "appellant had no right to be there." Resp. Mem. at 11, fn. 7 (citing to Resp. Exh. E (Respondent's Appellate Brief, People v. Leo Adam Somersall, Case No. A081134, at 48-49). Moreover, Respondent did not address the issue of prejudice. Id.

The first inquiry is whether the trial court's questioning the jurors about possible misconduct was a critical stage of the criminal proceedings. Stincer, 482 U.S. at 745. In Remmer v. United States, 347 U.S. 227 (1954), in response to an allegation of jury misconduct, the Supreme Court held,

> The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information. . . but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

1  Id. at 229-30.  Petitioner cites to no Supreme Court authority mandating a defendant's presence
2  at such a hearing.  Rather, Petitioner cites a number of Court of Appeals cases at the end of his
3  petition, including Walker v. Lockhart, 852 F.2d 379 (8th Cir. 1988).  In Walker, the trial judge
4  questioned jurors at a hearing at which both attorneys, but not the defendant were present, about
5  alleged juror misconduct.  Id. at 381.  The Eighth Circuit concluded that the defendant had a
6  constitutional right to be present at the proceeding, but it cited no Supreme Court authority to
7  support its decision.  Id. at 381-82.  Petitioner also cites the panel opinion in Campbell v. Rice,
8  302 F.3d 892 (9th Cir. 2002), which held that the Petitioner's due process rights were violated
9  when he was excluded from an in-chambers hearing at which the judge, prosecutor, and defense
10 counsel discussed a potential conflict of interest.  Id. at 900.  That opinion, however, was
11 superseded by the en banc decision in Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005), in
12 which the court concluded that "any error resulting from Petitioner's exclusion from the in-
13 chambers meeting was not a structural error but was, instead, trial error subject to harmless error
14 review."  Id. at 1172.  Petitioner thus fails to cite any controlling authority to support his
15 contention that his absence from the misconduct inquiry fundamentally violated his right to due
16 process with respect to his robbery conviction.

17       The second inquiry, assuming that the misconduct hearing was a critical stage of the
18 proceedings, is whether Petitioner's absence prejudiced the outcome of the hearing, or otherwise
19 deprived him of a fair and impartial trial.  Campbell, 408 F.3d at 1172-73.  Petitioner contends
20 that his conviction should be reversed because "no one asked the jurors whether, for any of them,
21 reaching a verdict on the murder charge had a bandwagon effect. . . on the robbery verdict,
22 meaning that once they convicted on the murder charge, they quickly convicted on everything
23 else so that they could go home."  Petition at 11.  The state appellate court rejected this
24 contention as pure speculation, stating,

25  > The conduct underlying the robbery conviction was plainly distinct from that on
       which the jury found appellant guilty of murdering Garcia, and none of the
26     elements or instructions on the robbery offense contains the word 'malice' or
       depends in any way on the jury's understanding of that term. . . There is no
27     evidence whatsoever that the jury used the dictionary for any purpose other than
       to inquire into the mens rea required for the various homicide charges it was
28     pondering."

Resp. Exh. I at 46-47.

Nonetheless, Petitioner alleges that, "[s]everal jurors testified that they, or others, withdrew their tentative verdict on robbery, and/or deliberately avoided voting on robbery, until they had consulted the dictionary on murder and voted on murder." Petition at 11. As Respondent points out, Petitioner's argument is not supported by the record. Only three jurors (jurors number four, five, and six) even mentioned the robbery charge when they were questioned regarding the incident. Juror number four, for instance, remembered the panel deciding robbery after murder, but explicitly stated that the panel only sought clarification of the term "malice" during deliberations. Resp. Exh. B at 1608. Juror number four stated "I think we did robbery after murder," but that, "I didn't care about the dictionary because we had gone through 'malice' several times . . . I felt I understood it and didn't need a further definition." Id. at 1607-1608. Juror number five initially testified that the only verdict remaining when the panel sought the dictionary was burglary. Id. at 1587. When prompted by the court, however, juror number five clarified that s/he meant robbery. Id. Juror number five also said s/he was not paying attention because s/he had already decided the issue.[5] Id. at 1586-87. Juror number six stated, "[w]e needed it I believe for the robbery," but also stated, "[m]y mind was made up before the dictionary; I know that." Id. at 1597.

Aside from these three jurors' statements, five jurors stated explicitly that murder was the only outstanding count at the time the dictionary was consulted. Exh. B at 1591 (juror number two), 1594 (juror number three), 1603 (juror number eleven), 1610 (juror number twelve), 1615 (juror number seven). Two other jurors maintained that the panel was still considering special allegations at the time the dictionary was consulted. Id. at 1600 (juror number one), 1617 (juror number eight). Although juror number nine did not specify what verdicts were still on the table,

---

[5] Contrary to Petitioner's allegation that defense counsel admitted to not paying attention during these proceedings, it was in fact juror number five who proffered the quote Petitioner attributes to counsel in his petition. Petition at 11 (citing to Exh. B at 1586-1587). A review of the record reveals that it was juror number five who stated, in response to the Court's inquiry regarding the dictionary definition, that "I will be quite honest; I was not paying attention, because I already had my opinion about the whole thing, so I wasn't paying a whole lot of attention." Exh. B at 1586-87.

s/he explicitly stated that nothing in the dictionary affected his/her verdict in any way. Id. at 1613. Juror number ten offered a similar response, indicating that "we had pretty much unanimously had a verdict. It really wasn't a matter of changing to come at a verdict; I think it was just a matter of clarifying. . . 'conscious' and 'malice.'" Id. at 1620. Contrary to Petitioner's claim, there is no indication that any of the jurors's opinions on the robbery conviction were affected by the dictionary consultation.

Petitioner maintains that "[i]f allowed to be present, [he] would have cause[d] trial counsel to pay attention. . . [and] to ask. . . [particular] questions."[6] Petition at 16. However, Petitioner fails to show that his absence necessarily undermined the integrity of the trial process and deprived him of a fair and impartial trial. Campbell, 408 F.3d at 1172-73; Hegler, 50 F.3d at 1476. At the jury misconduct proceeding, defense counsel repeatedly objected to the trial judge's questioning based on California Evidence Code section 1150. See e.g., Resp. Exh. B at 1582. Evidence Codes section 1150 provides, in relevant part,

\\\

\\\

---

[6] Petitioner submits the following specific questions he hypothetically would have urged defense counsel to ask the jurors during the proceeding: [¶] (1) Did some of the jurors hold or express opinions that Petitioner's supposed mental state in the robbery was related to supposed mental state, or malice, in the murder, such that they needed to find that Petitioner had criminal intent, or malice, in the murder, in order to find that he had criminal intent in the robbery? [¶] (2) Were there jurors who held, or expressed, concerns about Petitioner's degree of intoxication, such that if they thought he was too intoxicated to form the mental state needed for homicide, then he also was too intoxicated to form the mental state needed for robbery? [¶] (3) Why had some jurors not reached a verdict at all on robbery until they heard the dictionary definition, and why did those jurors then vote guilty on robbery after they heard the dictionary definition? [¶] (4) Why did some of the jurors withdraw their tentative verdicts on robbery until after they listened to the dictionary definitions, and what caused them to reinstate their verdicts on the robbery after they heard the dictionary definition? [¶] (5) Did some jurors only decide to convict Petitioner of robbery after they decided to convict Petitioner of murder, because they were unwilling to convict Petitioner on the lesser crime until they had convicted Petitioner on the greater crime? [¶] (6) Were there jurors who were ready to vote against the majority, in favor of acquittal, on the robbery, as long as there was a split verdict on the homicide, but who did not want to have a hung jury on the robbery, once there was a verdict on the murder charge? [¶] (7) The jury spent more than three full days deliberating: what were the issues on which there was disagreement? [¶] (8) What did the jurors say to each other about each of these topics?" Petition at 16.

> Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

Cal. Evid. Code § 1150 (a). In response to defense counsel's initial objection pursuant to § 1150, the trial court stated, "[y]ou may be correct counsel. . . I am just trying to preserve what occurred. This is not a hearing to determine whether or not a. . . motion for new trial should be granted." Resp. Exh. B at 1582. Petitioner's hypothetical questions, posed several years after the fact, seek similar insight into the mental processes of the jurors in violation of § 1150. Thus, they are indistinguishable in effect from the questioning sought to be excluded by defense counsel at the misconduct proceedings and explicitly precluded by § 1150. Additionally, Petitioner offers no explanation as to why he failed to raise such questions at the motion for new trial proceedings that took place less than a month later, at which he was present. Resp. Exh. B at 4.

     As previously stated, the appellate court found that the robbery charge involved a different victim and an entirely different incident at a different time than the alleged murder. Resp. Exh. I at 46-47. Thus, there is no correlation between the definition of malice sought by the jurors and the elements of robbery, which do not include malice. <u>Id.</u> As such, the underlying record does not support Petitioner's contention that the appellate court erred in concluding that the jury misconduct only affected Petitioner's murder conviction. Moreover, Petitioner has failed to show any prejudice resulting from the trial court's decision to hold the hearing in his absence.

     Finally, Petitioner alleges that "[t]he error in excluding Petitioner from this critical hearing was prejudicial for the further reason that the evidence which supported the robbery conviction was. . . fully contradicted. . . ." Petition at 18. Even assuming that the misconduct proceeding was a critical stage of the trial and that it was prejudicial to exclude Petitioner, any error was harmless based on the substantial evidence supporting Petitioner's robbery conviction. At least two eyewitness accounts corroborated Petitioner's assault and robbery of Colchado.

Santos Andrade was an uninvolved eyewitness who testified that he saw Petitioner, a boy of 16 or 17 whom he routinely saw near Petitioner's cabin, and two or three women continuously assault Colchado.  Resp. Exh. I at 10.  Veronica Faber, one of the young women at Petitioner's cabin on the night of the incident, testified that she saw Petitioner repeatedly kick Colchado.  Resp. Exh. I at 10.  She testified that Petitioner turned Colchado over while others went through his pockets.  Id.  The appellate court also observed that "[t]hree bloodstains on the back of Colchado's shirt were consistent only with [petitioner's] blood."  Resp. Exh. I at 18.

Based upon its review of the underlying record, the Court concludes that the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

### III. CONCLUSION

The Court finds that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for a writ of habeas corpus is denied.  The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: _____4/25/07_____           _____
                                         JEREMY FOGEL
                                         United States District Judge

1   A copy of this ruling was mailed on to the following:

2

3   Leo A. Somersall
    H-87605
4   Pleasant Valley State Prison
    P.O. Box 8501
5   Coalinga, CA  93210

6

7   Jeremy Friedlander
    California Attorney General's Office
    455 Golden Gate Avenue
8   Suite 11000
    San Francisco, CA  94102-7004

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28